UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Tammy Jean Morin

    v.                                    Civil No. 10-cv-159-JL
                                          Opinion No. 2011 DNH 091

Michael J. Astrue, Commissioner,
Social Security Administration

**MEMORANDUM ORDER**

This is an appeal from the denial of a claimant's application for Social Security Disability Benefits.  See 42 U.S.C. § 405(g).  The claimant, Tammy Jean Morin, contends that the administrative law judge ("ALJ") incorrectly found that although Morin suffered from multiple sclerosis and depression, Admin. R. 22;[1] see 20 C.F.R. §§ 404.1520 (a),(c), she retained the residual functional capacity ("RFC") to perform a full range of light work, Admin. R. 24; see 20 C.F.R. § 404.1520(a)(4)(iv), and that given her age, education and work experience there were a significant number of job opportunities available to her. Admin. R. 28; see 20 C.F.R. § 404.1520(a)(4)(v); pt. 404, subpt. P, App.2, § 202.  Morin contends that the ALJ erred in formulating her RFC because he:

---

[1] The court will reference the administrative record ("Admin. R.") to the extent that it recites facts contained in or directly quotes documents from the record.  Cf. Lalime v. Astrue, No. 08-cv-196-PB, 2009 WL 995575, at *1 (D.N.H. Apr. 14, 2009).

(1) improperly relied on the RFC assessments of non-treating consulting physicians and gave lesser weight to the functional capacity assessment of her treating physician, see generally 20 C.F.R. §§ 404.1502, 404.1527(d); SSR No. 96-2p, 1996 WL 374188 (July 2, 1996),

(2) misinterpreted her medical records, and,

(3) did not properly consider her fatigue and its effect on her daily activity level.

The Commissioner asserts that the ALJ's findings are supported by substantial evidence in the record, and moves for an order affirming his decision.[2]  This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 405(g) (Social Security).  After a review of the administrative record the court grants the Commissioner's motion and denies Morin's motion.


I.   **APPLICABLE LEGAL STANDARD**

The court's review under Section 405(g) is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); see Simmons v. Astrue, 736 F. Supp. 2d 391, 399 (D.N.H. 2010).  If the ALJ's factual findings are supported by substantial evidence in the record,

_____

[2]On review, the Decision Review Board affirmed the ALJ's order, Admin. R. 4; see generally 20 C.F.R. § 405.405, rendering it a final decision of the Commissioner appealable to this court. See 20 C.F.R. § 405.420(b).

they are conclusive, even if the Court does not agree with the ALJ's decision and other evidence supports a contrary conclusion. See Tsarelka v. Sec'y of Health & Human Servs., 842 F.2d 529, 535 (1st Cir. 1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotations omitted). The ALJ is responsible for determining issues of credibility, resolving conflicting evidence, and drawing inferences from the evidence in the record. See Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Pires v. Astrue, 553 F. Supp. 2d 15, 21 (D. Mass. 2008) ("resolution of conflicts in the evidence or questions of credibility is outside the court's purview, and thus where the record supports more than one outcome, the ALJ's view prevails"). The ALJ's findings are not conclusive, however, if they were "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35. If the ALJ made a legal or factual error, the decision may be reversed and remanded to consider new, material evidence, or to apply the correct legal standard. Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16, 19 (1st Cir. 1996); see 42 U.S.C. § 405(g).

## II.  **BACKGROUND**

Pursuant to this court's local rules, the parties filed a
Joint Statement of Material Facts (document number 12), which is
part of the record reviewed by the court.  See LR 9.1(d). This
court will briefly recount the key facts and otherwise
incorporates the parties' joint statement by reference.

Briefly, Morin filed an application for Disability Insurance
and Supplemental Security Income benefits in March 2008 claiming
she became disabled in February 2008[3] due to multiple sclerosis.[4]
See Admin. R. 140-44, 154.  Morin reported that she was no longer
able to work due to severe "pain, eye pain, and fatigue . . .
memory problems and balance problems."  Id. at 154.  She stated
that although she "had MS for years [and] have been able to work"
as the executive director of an adult day care center, by

---

[3]Morin's application for disability insurance benefits lists
her onset date as February 2, 2008, see Admin. R. 140, while her
supplemental income application and disability report lists the
onset date as February 28, 2008.  See id. at 142, 154.

[4]Multiple sclerosis is "a disease in which there are foci of
demyelination throughout the white matter of the central nervous
system, sometimes extending into the gray matter; symptoms
usually include weakness, incoordination, paresthesias, speech
disturbances, and visual complaints.  The course of the disease
is usually prolonged, so that the term *multiple* also refers to
remissions and relapses that occur over a period of many years.
Four types are recognized, based on the course of the disease:
*relapsing remitting, secondary progressive, primary progressive,*
and *progressive relapsing*.  The etiology is unknown."  Dorland's
Illustrated Medical Dictionary, 1706 (31st ed. 2007).
Demyelination is the "destruction, removal, or loss of the myelin
sheath of a nerve or nerves."  Id. at 493.

February 2008, she "just couldn't [do] the job any longer."  Id.;
see id. at 155.

Her applications for benefits were denied in September 2008,
id. at 62, because it was determined that although Morin had
"some significant medical problems, . . . they do not meet the
severity level for Social Security disability benefits."  Id. at
65.  Morin appealed that decision to the ALJ, id. at 74-75; see
generally 20 C.F.R. § 405.301, who, after a hearing in November
2009, concluded that Morin was not disabled and thus not entitled
to benefits.  Admin. R. 34-56, 29; see generally 20 C.F.R. §
404.1520.

The ALJ found that Morin was severely impaired due to
multiple sclerosis and depression.  Admin. R. 22; see generally
20 C.F.R. § 404.1520(a)(4)(ii).  He denied benefits, however,
because he concluded that despite her impairments, Morin
maintained a residual functional capacity[5] "to perform a full
range of light work, lifting 20 pounds occasionally and 10 pounds
frequently.  She is able to maintain attention and concentration
for at least two hours at a time and can persist at simple tasks
during an eight-hour workday and 40 hour week."  Admin. R. 24;

---

[5]"Residual Functional Capacity" is defined as "an assessment
of an individual's ability to do sustained work-related physical
and mental activities in a work setting on a regular and
continuing basis.  A 'regular and continuing basis' means 8 hours
a day, for 5 days a week, or an equivalent work schedule."  SSR
No. 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

see generally, 20 C.F.R. § 404.1520(a)(4)(iv).  The ALJ concluded that Morin was unable to perform her past work as director of an adult day care center because "[t]he demands of [Morin's] past relevant work exceed the residual functional capacity established above."  Admin. R. 28.  Nevertheless, the ALJ concluded that Morin was not disabled because, according to a vocational expert who testified at the hearing, she retains the ability to perform jobs that exist in the entire light unskilled job base.  Id.

The ALJ declined to give controlling weight to treating physician Dr. Enrico Lallana's opinion, in a physical capacities questionnaire, that Morin was completely disabled.[6]  Id. at 27, 394-399.  The ALJ discounted Dr. Lallana's opinion because he found it "wholly inconsistent" with "the records of [Dr. Lallana's] own treatment" because, according to the ALJ, "[t]hese records include observations that [Morin's] multiple sclerosis is stable and that [Morin] is doing well with medication."  Id. at

_____

[6]Dr. Lallana opined that Morin was unable to lift or carry more than 10 pounds, sit for more than two hours, stand for more than one hour, and walk for more than 10 minutes in an eight-hour workday.  He also found severe restrictions in Morin's ability to use her hands or feet.  Dr. Lallana stated that she was unable to perform any postural activities, and could not tolerate exposure to heights, moving parts, humidity, dust and odors, extreme cold or heat, and vibrations.  Id. at 394-99.  Dr. Lallana did not discuss the rationale behind his conclusions, nor did he "[i]dentify the particular medical or clinical findings" supporting his assessment as requested on the "Medical Source Statement" form provided by the Social Security Administration.  Id. at 394, 398.

27.  Instead, the ALJ adopted the medical opinion of a non-examining consulting physician, Dr. Burton Nault, who determined that Morin could lift twenty pounds occasionally and ten pounds frequently, and could sit, stand, and walk for six hours in each workday and had no postural, manipulative, visual, communicative, or environmental limitations.  Id. at 27, 279-286.

The ALJ also considered Morin's mental limitations.  He concluded, based on an assessment by a consulting psychologist, Dr. Russell Phillips, and an evaluation completed by Dr. Elizabeth P. Hess, Ph.D., that Morin possesses good communication and social skills, and responds well to stress, but she "does, however, have difficulty completing complex tasks due to fatigue and poor sustained concentration."  Id. at 27, see id. at 295-99, 301-13.  Therefore, ALJ determined although the demands of her former employment exceeded her functional capacity, see generally 20 C.F.R. § 1520(a)(4)(iv), Morin was still capable of performing light unskilled labor.  Admin. R. 28; see generally 20 C.F.R. § 1520(a)(4)(v).

## III.  **ANALYSIS**

A five-step process is used to evaluate an application for social security benefits.  20 C.F.R. § 404.1520(a)(4).  The applicant bears the burden through the first four steps to show

that she is disabled.[7]  Freeman v. Barnhart, 274 F.3d 606, 608
(1st Cir. 2001).  At the fifth step, the Commissioner bears the
burden of showing that a claimant has the residual functional
capacity to perform other work that may exist in the national
economy.  Id.; see also 20 C.F.R. § 404.1520(a)(4)(v); Heggarty
v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's
conclusions at steps four and five are informed by his assessment
of a claimant's residual functional capacity ("RFC"), which is a
description of the kind of work that the claimant is able to
perform despite her impairments.  20 C.F.R. §§ 404.1520(a)(4),
404.1545.

Here, the ALJ denied Morin's application because he
concluded, at the fifth step of the evaluation, that although
Morin was impaired, and the impairment rendered her unable to
return to her prior work, she possessed the RFC to engage in
light, unskilled work.  The ALJ determined, after consultation
with a vocational expert, that a significant number of such jobs

---

[7]Specifically, the claimant must show that:  (1) she is not
engaged in substantial gainful activity; (2) she has a severe
impairment; (3) the impairment meets or equals a specific
impairment listed in the Social Security regulations; or (4) the
impairment prevents or prevented her from performing past
relevant work.  The Social Security Act defines disability as the
"inability to engage in any substantial gainful activity by
reason of any medically determinable physical or mental
impairment which can be expected to result in death or which has
lasted or can be expected to last for a continuous period of not
less than 12 months."  42 U.S.C. § 423(d)(1)(A).

existed in the national economy.  After the Decision Review Board
affirmed the ALJ's decision, this appeal followed.

## A. Treating and non-treating physicians

Morin primarily finds fault with the ALJ's decision not to
adopt the RFC assessment of her treating physician, Dr. Lallana,
and instead rely on the assessment of two state agency
physicians, Drs. Nault and Phillips.[8]  The analysis thus involves
whether, on the record before him, the ALJ could permissibly (1)
discount a treating source opinion that Morin's condition
severely limited her ability to work, and (2) instead rely on the
opinions two non-examining consulting physicians to formulate
Morin's RFC.

There is precedent allowing an ALJ to rely both exclusively
on the assessments of non-testifying, non-examining physicians,
see Berrios Lopez v. Sec'y of Health & Human Servs., 951 F.2d
427, 431-32 (1st Cir. 1991), and on the assessment of a non-
treating physician in lieu of a treating physician.  See Tremblay
v. Sec'y of Health & Human Servs., 676 F.2d 11, 12-13 (1st Cir.
1982); Reeves v. Barnhart, 263 F. Supp. 2d 154, 160-162 (D. Mass.
2003).  Conflicts between treating and non-treating, non-

---

[8]Dr. Nault evaluated Morin's physical functional capacity,
Admin. R. 279-86, while Dr. Phillips completed a psychiatric
review and evaluated her mental RFC.  Id. at 301-17.

examining doctors are for the ALJ to resolve. Tremblay, 676 F.2d at 12. The decision to resolve that conflict against the claimant should be affirmed if "that conclusion has substantial support in the record . . . ." Id.; see also DiVirgilio v. Apfel, 21 F. Supp. 2d 76, 77 (D. Mass. 1998). Where the treating physician's disability assessment is conclusory, an ALJ need not grant that opinion greater weight than a consulting physician. Tremblay, 676 F.2d at 13. Moreover, an ALJ may reasonably rely more heavily on a non-treating physician's opinion where it is supported by the objective medical evidence, and, in contrast, the treating physician's opinion is "for the most part, based on [the claimant's] own descriptions of pain." Reeves, 263 F. Supp. 2d at 161. Moreover, the ALJ's decision to adopt an assessment by a non-treating physician is further supported if that assessment references specific medical findings indicating that the claimant's file was reviewed with care. See Berrios Lopez, 951 F.2d at 431 (ALJ could rely on non-examining physician where RFC assessment did not "contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity"). For the reasons that follow, the court concludes that on the specific facts of this case, the ALJ could properly rely on the opinions of Drs. Nault and Phillips and choose not to adopt the opinion of Dr. Lallana.

10

### 1. Treating source opinions

Morin briefly asserts that the ALJ erred because he did not give Dr. Lallana's opinion controlling weight, and also did not properly apply statutory factors used to determine the credit given to that opinion.  Cl. Br. 23-24; see generally 20 C.F.R. 404.1527(d).  Although the ALJ is the ultimate arbiter of a claimant's RFC, he is prohibited from disregarding relevant medical source opinions.  See generally SSR No. 96-5p, 1996 WL 374183, at *5 (July 2, 1996).  Greater weight is given to a treating source[9] "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(d)(2).  But an ALJ need not give a treating physician's opinion greater weight if it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is . . . inconsistent with other substantial evidence."  SSR No. 96-2p, 1996 WL 374188, *1 (quotations omitted); see generally Marshall v. Astrue, No. 08-cv-147-JD, 2008 WL 5396295, at *3 (D.N.H. Dec. 22, 2008); Lopes v. Barnhart, 372 F. Supp. 2d 185, 193-94 (D. Mass. 2005); 20 C.F.R. § 404.1527(d)(2).

---

[9]It is undisputed that Dr. Lallana is a "treating source." See generally 20 C.F.R. § 404.1502.

11

There is substantial record support for the ALJ's conclusion that Dr. Lallana's functional assessment was "wholly inconsistent" with his medical notes.  See Admin. R. 27; cf. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991) (decision of ALJ must be affirmed where "there is substantial evidence to support the Secretary's decision"); SSR No. 96-2p, 1996 WL 374188, at *2 (treating source opinion not given controlling weight if it is inconsistent with substantial evidence in the record); Monroe v. Barnhart, 471 F. Supp. 2d 203, 211 (D. Mass. 2007)("Although opinions from treating and examining physicians may be considered helpful, and in many cases controlling, the hearing officer is only required to make a decision that is supported by substantial evidence."); cf. 20 C.F.R. § 404.1527(d)(2); Graham v. Barnhart, No. 02-CV-243-PB, 2006 WL 1236837, at *6 (D.N.H. May 9, 2006) (medical opinion given less weight because it was inconsistent with the record as a whole).  Dr. Lallana's notes from September 2008 indicate that although Morin reported "intermittent daily fatigue," she appeared "well, not in distress."[10]  Id.  She

---

[10]Although Morin reported increased stiffness and muscle aches, these complaints do not support the severe functional limitations Dr. Lallana included in his report.  Dr. Lallana noted that Morin "continues to have occasional paresthesias in her extremities, but these have been stable and not any different from what she reported previously.  The lower extremities seem to be stiff when she goes to bed at night.  She only notices the symptoms when she is lying in bed trying to sleep.  The symptoms

12

demonstrated normal motor "tone and 5/5 strength in the upper extremities." Id. Dr. Lallana stated that "[t]here is slightly poor effort with the lower extremities, with maximum strength elicited being 4/5 in the lower left extremity, and 5/5 in the lower right extremity." Id. He observed that Morin's "[a]ttention, concentration, and recall are normal," and that she had a "normal gait but has mild difficulty with tandem" movement. Id. Dr. Lallana indicated that her multiple sclerosis "appears stable and she seems to be doing well with interferon."[11] Id. at 357.

Similarly in January 2009, Dr. Lallana noted that although Morin "reports new onset of bilateral lower extremity 'stiffness' that she only feels at night whenever she lies down on her bed . . . [t]here is no pain." Id. at 380. Dr. Lallana observed that Morin exhibited normal attention, concentration and recall, normal coordination and gait. Id. at 381. Dr. Lallana also observed that Morin "has normal motor bulk and tone. Upper and right lower extremity strength is 5/5. The left leg is 5-/5." Id. Lallana next saw Morin in April 2009 and reported that

of her lower extremities prevent her from sleeping. Standing up and putting pressure on the legs seems to decrease the sensation. There is no pain or muscle spasms that she can directly point to." Admin. R. 356.

[11]Interferon is "any of a family of glycoproteins that exert virus-nonspecific but host-specific antiviral activity . . . ." Dorland's Illustrated Medical Dictionary, 962 (31st ed. 2007).

although she had a relapse in December 2008 "these symptoms have improved." Id. at 373.  At that time, however, Lallana stated that Morin reported a "recurrence of some of her symptoms particularly the muscle spasms and myoclonus.[12]  She notes discomfort in her legs and occasional jerking movements when she is resting.  Her fatigue has also increased and her concentration became poorer." Id.  Lallana suggested further testing as Morin did not complete follow-up tests after her last visit.  Id. Later that month he reported to Morin that "I have reviewed your laboratory test results and they are stable at this time."[13]  Id. at 370.  Viewed in total, Lallana's office notes hardly support his later functional capacity evaluation that Morin was severely restricted in her ability to lift, walk, sit, stand or perform any postural functions.[14]  See id. at 394-98.

The ALJ's decision not to credit Dr. Lallana's opinion is further bolstered by the fact that Dr. Lallana neither discussed his reasons for the assessment nor cited objective medical

---

[12]"Myoclonus" is "shocklike contractions of a portion of a muscle, an entire muscle, or a group of muscles."  Dorland's Illustrated Medical Dictionary, 1241 (31st ed. 2007).

[13]Notably, during a visit to the Coos County Family Health Services in May 2009, the nurse practitioner who examined Morin stated that Morin's "MS is fine."  Id. at 388.

[14]Particularly unsupported is his opinion that Morin could only sit for a total of two hours, stand for a total of one hour, or walk for a total of ten minutes during an eight-hour workday. Id. at 395.

testing or records relied on to make his assessment.  Id. at 398.
"[A] medical opinion should be given less weight if it does not
include relevant evidence to support the opinion, particularly
medical signs and laboratory findings."  Graham, 2006 WL 1236837,
at *6 (quotations and brackets omitted); see 20 C.F.R. §§
404.1527(d)(2), (d)(3); cf. Berrios Lopez, 951 F.2d at 431
(noting that consulting physician's reports are entitled to
little weight if they include "the mere checking of boxes").  In
this case, Dr. Lallana merely checked off boxes indicating
Morin's functional abilities.  Admin. R. 394-99.  He left blank
the narrative portion of the form asking him to "[i]dentify the
particular medical or clinical findings (ie:  physical exam
findings, x-ray findings, laboratory test results, history, and
symptoms including pain, etc.) which support your assessment or
any limitations and why the findings support the assessment."
Id. at 398.  Accordingly, the record, viewed in whole, supports
the ALJ's decision not to give controlling weight to Dr.
Lallana's functional assessment.[15]

_____

[15]Morin also faults the ALJ for failing to give "good
reasons" for his decision to discount Dr. Lallana's opinion.
Morin's argument on this issue is very brief, but appears to be
two-fold.  Morin asserts error in applying the "good reasons"
requirement in functional terms, i.e.:  the requirement that an
order must articulate the ALJ's reasoning for the weight assigned
to medical sources.  See Marshall, 2008 WL 5396295, at *4 (error
where treating source opinion "simply overlooked").  She then
asserts the ALJ's substantive *reasoning* was insufficient.  The
court disagrees.

## 2. Reliance on non-treating physicians

Morin next argues that "the ALJ's complete reliance on the opinions of state agency doctors to determine [Morin's] RFC is

---

The ALJ certainly made clear both the weight given to Dr. Lallana's opinion and the reasons for that reduced weight. Cf. Costa v. Astrue, No. 1:09-cv-441-JL, 2010 WL 4365868, at *7 (D.N.H. Nov. 3, 2010) (ALJ erred because he completely ignored treating source opinion contradicting his RFC assessment). The ALJ's RFC determination included a summary of medical notes from the Multiple Sclerosis Center and objective medical tests. Although he stated his reasons for discounting Dr. Lallana's opinion in summary fashion, it is clear from the text that the ALJ was referring to those notes discussed more thoroughly previously in the order, thus giving the court a sufficient window into his analysis to allow for review. See SSR No. 96-2p, 1996 WL 374188, at *5.

Substantively, Morin contends that the ALJ did not satisfy the "good reasons" requirement of 20 C.F.R. § 404.1527(d)(2) because he "did not thoroughly analyze" certain statutory factors to determine the weight given medical opinions. Cl. Br. 23. "Several factors determine the weight that a medical opinion is due, including (a) the nature, length, and specialty of the examining relationship, (b) the amount of objective medical signs and laboratory findings supporting the opinion, and (c) consistency of the opinion with the record as a whole." O'Dell v. Astrue, 736 F. Supp. 2d 378, 386 (D.N.H. 2010) (discussing factors that guide analysis of proper weight to give a medical opinion); see also 20 C.F.R. § 404.1527(d)(2). Because these factors are "malleable," Lalime, 2009 WL 995575, at *5, an ALJ is not required to methodically apply them so long as the ALJ's decision makes it clear that these factors were properly considered. Id. It is apparent from the order that the ALJ understood that Dr. Lallana was a specialist who treated Morin at the Multiple Sclerosis Center. As seen supra, Dr. Lallana's RFC assessment was at odds with the medical records from the Multiple Sclerosis Center and any evidence or reasoning supporting his opinion was wholly missing from the function report form. The ALJ's discussion of his decision to discount Dr. Lallana's medical source statement, although summary in fashion, when viewed in conjunction with the ALJ's RFC analysis, was sufficient.

very troubling."  Cl. Br. 21.  She contends that this was error because Dr. Nault's assessment, written in April 2008, Admin. R. 279-86, was based on medical records pre-dating her onset date and Dr. Phillips's mental capacity evaluations, written in September 2008, id. at 301-17, were faulty because Dr. Phillips "did not see any medical evidence submitted after August of 2008 and, consequently, did not see the clear interrelationship between [Morin's] MS and her depression."  Cl. Br. 21.

In a step four analysis, the ALJ, having already determined that the claimant suffers a severe impairment, compares the physical and mental demands of the claimant's past work with her current functional capacity or RFC.  If the residual function capacity finding is supported by substantial evidence in the record, it is conclusive.  See Nguyen, 172 F.3d at 35.  When an individual is found to have an impairment, his or her ability to work is assessed in two ways:  the "medical source statement" and the RFC assessment.

> Even though the adjudicator's RFC assessment may adopt
> the opinions in a medical source statement, they are
> not the same thing:  A medical source statement is
> evidence that is submitted to [the] SSA by an
> individual's medical source reflecting the source's
> opinion based on his or her own knowledge, while an RFC
> assessment is the adjudicator's ultimate finding based
> on a consideration of this opinion and all the other
> evidence in the case record about what an individual
> can do despite his or her impairment(s).

17

SSR No. 96-5p, 1996 WL 374183, at *4.  Determination of a claimant's residual functional capacity, however, is, in the end, an administrative decision that is the sole responsibility of the Commissioner.  See 20 C.F.R. § 404.1527(e)(2), SSR No. 96-5p, 1996 WL 374183, at *2.

An ALJ is required to consider the medical opinions from all acceptable medical sources regarding the nature and severity of a claimant's impairments and resulting limitations.  See 20 C.F.R. § 404.1527.  Because state agency physicians and consultants are experts in social security disability programs, their opinions on the nature and severity of a claimant's impairments cannot be ignored by an ALJ.  See SSR No. 96-6p, 1996 WL 374180, at *2 (July 2, 1996); 20 C.F.R. § 404.1527(f).  "[T]he First Circuit explained [that] an advisory report of a non-examining, non-testifying physician is entitled to evidentiary weight, which will vary with the circumstances, including the nature of the illness and the information provided the expert."  Reeves, 263 F. Supp. 2d at 161 (quotations omitted), see Berrios Lopez, 951 F.2d at 431.

The court concludes that the ALJ was justified in adopting the opinions of Dr. Nault and Dr. Phillips regarding the disabling effects of Morin's multiple sclerosis, see Admin. R. 279-86, as well as Morin's mental capacity, see id. at 301-17.

18

First, when formulating an RFC, an ALJ looks at all the medical and other relevant evidence in the file.  See SSR No. 96-5p, 1996 WL 374183, at *4-*5.  Here, the ALJ supported his decision with multiple references to medical findings and other evidence dated before and after the assessments completed by Drs. Nault and Phillips.  Contrary to Morin's assertion that the ALJ placed "complete reliance" on their assessments, the ALJ formulated his RFC based on a review of all the evidence and then adopted the state agency doctor's opinions after determining that they "are not inconsistent with the other substantial evidence in the record."  Admin. R. 27.

Further, there is substantial record support for the ALJ's conclusion that the evaluations by the state agency physicians were consistent with the evidence.[16]  The record indicates that Dr. Nault reviewed Morin's file in April 2008 and made specific

---

[16]Similarly, Morin's argument that the ALJ impermissibly relied on Dr. Phillips assessment lacks merit.  Primarily, Dr. Phillips relied on an exam completed by consulting psychologist Dr. Elizabeth P. Hess, who examined Morin and evaluated the effects of Morin's depression and the effect of multiple sclerosis on her cognitive abilities.  See Admin. R. 313, 317 (Phillips), 295-99 (Hess evaluation), 27 (ALJ's recitation of Dr. Hess's findings); Cl. Br. 16 (Morin acknowledged that review based on evaluation by Dr. Hess).  Further, the ALJ incorporated mental incapacity directly linked to multiple sclerosis in his determination that she can perform only "simple tasks," Admin. R. 24, and his conclusion that Morin was incapable of performing her prior work because the mental requirements of that position were beyond her current capacity.  Admin. R. 28.

findings referencing her medical records and personal function report.  Id. at 286;  cf. Berrios Lopez, 951 F.2d at 431.  Dr. Nault noted evidence of a flare up of symptoms in October 2007, but that Morin showed improvement after receiving three days of steroid therapy.  Admin. R. 286.  Medical reports from the Dartmouth-Hitchcock Multiple Sclerosis Center confirm that Morin did report a flare-up, but by November, the nurse practitioner at the center informed Morin that her "MRI is stable overall.  This is a good report."  Id. at 218-19.  Subsequent medical records indicate that Dr. Nault's assessment was correct.  Records from the Multiple Sclerosis Center dated three days before Nault's assessment[17] indicate that Morin experienced a flare-up of symptoms in 2007, but showed recovery of strength.  Id. at 361-63.  By September 2008, Morin demonstrated further improvement in strength, id. at 356, while her reports of fatigue improved from daily at the level of a "10"on a 10 point scale, id. at 214 (October 2007), to "intermittent."  Id. at 356 (September 2008).  Moreover, as discussed at length supra, there is objective medical evidence, statements made by Morin during counseling sessions, and other record evidence supporting Dr. Nault's conclusion that Morin's multiple sclerosis, though severe impairment, was not disabling.

---

[17]It is not clear from the record whether Dr. Nault reviewed the April 2007 records.

In sum, the ALJ could properly rely on the opinions of Dr. Nault and Dr. Phillips because "the ALJ did not consider the non-examining doctor's advisory opinion[] alone but in the context of other evidence, including the treating doctor's reports, a consultative examination, . . . and [his] credibility assessment of the [claimant's] pain.  Taken together, this evidence is substantial."  DiVirgilio, 21 F. Supp. 2d at 82.

## B. Residual functional capacity

### 1. Interpretation of medical records

Morin next contends that the ALJ erred when he relied, in part, on medical records indicating that Morin's multiple sclerosis was "stable."  Cl. Br. 24-25.  In his order, the ALJ noted that:

> In December 2008 the claimant developed tingling in her lower left extremity.  She was treated with three days of [methylprednisolone][18] and her symptoms improved significantly.  (Exhibit 17F-12).  When seen in follow-up in the Multiple Sclerosis Center in January 2009, her motor strength was normal in both upper extremities [and] in her right lower extremity.  Motor strength in the claimant's left lower extremity was 5-/5.

---

[18]The medical records referenced by the ALJ spelled the medication administered as "methylprednisolone," Admin. R. 380, not "methylprednisone."  Id. at 26.  "Methylprednisolone" is a synthetic medicine "derived from progesterone, used in replacement therapy for adrenocortical insufficiency and as an antiinflammatory and immunosuppressant in a wide variety of disorders." Dorland's Illustrated Medical Dictionary, 1171 (31st ed. 2007).

> Sensation and coordination were normal.  The claimant
> was able to ambulate with a normal gait but she could
> not tandem walk.  Dr. Lallana recommended a repeat MRI
> scan of the claimant's brain; however, the claimant was
> a no-show for the scheduled procedure.  (Exhibit 17F-
> 13).  Laboratory testing done on April 23, 2009
> confirmed that the claimant's condition was stable
> (Exhibit 17F-2).[19]

Admin. R. 26.  There was no error.

Morin essentially argues that the ALJ misinterpreted the

term "stable" to mean "capable of engaging in substantial gainful

activity."  It is true that a medical opinion that a patient's

condition is stable

> does not compel the conclusion that [a] claimant was
> capable of engaging in substantial gainful activity
> . . . .  The mere fact that [her] condition was
> 'stable' does not shed any light on [her] residual
> functional capacity, nor does it provide any
> information as to whether [she] was or was not disabled
> at the time.  . . . [I]t is entirely possible for a
> comatose patient to be 'stable,' yet plainly lack the
> ability to engage in substantial gainful activity.

Barriault v. Astrue, No. 07-cv-176-SM, 2008 WL 924526, at *7

(D.N.H. Apr. 2, 2008) (citations omitted); see Kohler v. Astrue,

546 F. 3d 260, 268 (2d Cir. 2008) (error for ALJ to interpret the

term "stable" as "good" where it is possible that claimant was

"stable at a low functional level").  Thus, a conclusion that a

patient is "stable" must be evaluated for purposes of an RFC

determination in the context of a patient's entire medical

---

[19]This passage represents a small fraction of the ALJ's
multi-page evaluation of the record evidence conducted to support
his RFC determination.  See Admin. R. 24-27.

record.  Cf. Gude v. Sullivan, 956 F. 2d 791, 794 (8th Cir. 1992); Fleshman v. Sullivan, 933 F.2d 674, 676 (8th Cir. 1991) (medical note that kidney transplant patient was "doing well" insufficient basis to discount claimant's allegations of pain where evidence "overwhelmingly" supported reports of pain and disability).

In this case, the ALJ's reference to the fact that Morin's condition was "stable" comprised a brief summary notation in a multi-paragraph discussion of the objective medical evidence (physical and mental) relevant to Morin's functional abilities. It is clear from the context of the ALJ's discussion (and medical records from the Multiple Sclerosis Center) that the descriptive term "stable" referred to the fact that Morin had not experienced any additional "flare-ups" by April 2009, and that she continued to exhibit good upper and lower extremity motor strength, normal sensation and coordination, and a normal gait demonstrated during her January 2009 exam.  Admin. R. 26, 370, 381.  Therefore, "[i]n the context of the record as a whole, in the context of the treatment notes to which the ALJ cites, and in the context of the paragraph in which the ALJ uses the superlative[], there is a frame of reference which provides appropriate meaning to the superlatives used." Dannels v. Astrue, No. 07-4122-JAR, 2008 WL 4191530, at *16 (D. Kan. Sept. 11, 2008) (applying Gude, 956 F. 2d at 794).

23

**2. Fatigue and daily activities**

Finally, Morin contends that the ALJ erred when he concluded that Morin's "rather wide range of daily activities" supported his conclusion that she could perform substantial gainful activity.  Cl. Br. 26; see Admin. R. 27.  She argues that her daily activities were limited in nature, required frequent rest, and thus did not support a finding that she was capable of sustained effort in a competitive environment.

Standing alone, the ability to perform basic household tasks does not equate with an ability to perform substantial gainful activity.  See generally 20 C.F.R. § 404.1572.  "When evaluating the subjective claims of pain it is proper and, indeed required that the ALJ consider daily activities such as driving, walking and household chores.  This allows the Secretary to juxtapose the claimant's subjective allegations of pain with the relative intensity of [her] daily regimen."  St. Pierre v. Shalala, No. CV-94-232-JD, 1995 WL 515515, at *3 (D.N.H. May 25, 1995) (citations omitted).  "To be found disabled, a claimant must show that [she] cannot perform 'substantial gainful activity,'[20] not

_____

[20]"Substantial gainful activity" means an ability to "perform substantial services with reasonable regularity either in competitive or self-employment."  Blake v. Apfel, No. 99-126-B, 2000 WL 1466128, at *8 (D.N.H. Jan. 28, 2000) (quotations omitted).

that [she] is totally incapacitated." Id. (quotations omitted).
Daily activity evidence is used to "assist the Secretary in
understanding the relationship between the medically determinable
impairment, the alleged pain, and the [claimant's] ability to
work." St. Pierre, 1995 WL 515515, at *4.

Although "a claimant's ability to engage in limited daily
activities, including light housework, is not necessarily
inconsistent with the inability to perform substantial gainful
activity," Blake, 2000 WL 1466128, at *8 (quotations omitted), a
review of the entire record reveals ample support for the ALJ's
conclusion that Morin's daily activity level was consistent with
an ability to perform light duty work.[21]  In her Function Report,
Morin stated that she cooks ("complete meals") and cleans for her
husband and son, cleans and feeds her cat and dog (including
taking the dog for walks), goes grocery and clothes shopping,
drives, and is able to go outside "daily."  Admin. R. 173-74,
178-80.  She described minimal issues with self care and is able
to manage her personal finances.  Id. at 174, 179-80.  Morin
reported that she engages in hobbies (knitting, reading, TV,
cooking) "daily," and socializes with others and plays darts

---

[21]Although Morin urges the court to view daily activity
evidence as supportive of disability, "a court must affirm the
Commissioner's decision so long as it is supported by substantial
evidence, even if the record could arguably justify a different
result." DiVirgilio, 21 F. Supp. 2d at 77.

weekly.  Id. at 180.  Although Morin reported overwhelming
fatigue in her testimony and function report, Admin R. 41-42,
183, during an evaluation by clinical psychologist Dr. Elizabeth
Hess in August 2008 Morin "describe[d] 'going nonstop all day'."
Id. at 298.  Morin also reported to Dr. Hess that she "often
cooks a great deal," id., knits, sews, and crochets, id., "[a]t
times she swims in her pool," id., and "enjoys socializing with
friends and plays darts in a league."  Id.[22]  It cannot be said,
therefore, that the ALJ erred in viewing record evidence of
Morin's daily activities as supportive of a light RFC.  Morin's
description of her daily activities in her Function Report and in
her evaluation with Dr. Hess reasonably reflect an ability to
engage in sustained activity (she is "going nonstop all day"),
despite periods of fatigue, at a light exertional level.  Id. at
173 (Morin describes rising at 6:00 AM daily and engaging in a
relatively long list of household chores and errands); Simmons,
736 F. Supp. 2d at 402-403 (record supported ALJ's finding of no
disability on part of claimant with multiple sclerosis despite
complaints of overwhelming fatigue where physical and
neurological exams showed mostly "normal functionality" and

---

[22]In her Function Report, Morin stated that as of May 2008
her fatigue was so severe that she could only walk 100 feet
before needing to stop and rest.  Id. at 181.  In her interview
with Dr. Hess three months later, however, Morin reported that
"she used to walk four miles a day, but finds recently that even
two miles is too much and she becomes quite tired."  Id. at 298.

claimant reported ability "to perform a variety of household chores such as laundry . . . ."); cf. St. Pierre, 1995 WL 515515, at *4 (daily activity evidence used to understand relationship between impairment and ability to work).

Finally, the court determines that Morin's remaining allegations of error[23] are without merit because the record adequately supports the ALJ's conclusions.  See Irlanda Ortiz, 955 F.2d at 769 ("We must uphold the Secretary's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." (quotations and ellipses omitted)).

IV. **CONCLUSION**

Pursuant to sentence four of 42 U.S.C. § 405(g), Morin's motion to reverse and remand the Commissioner's decision[24] is denied.  The Commissioner's motion to affirm the decision[25] is granted.  The Clerk of Court is directed to enter judgment in accordance with this order and close the case.

---

[23]For example, Morin briefly contends that the ALJ erred because his RFC assessment did not fairly or adequately discuss her chronic symptoms and that his analysis was deficient.  Cl. Br. 7.  As discussed supra, there was ample support for the ALJ's RFC assessment, and Morin's argument appears to fault the ALJ for not resolving conflicts in the evidence in her favor.

[24]Document no. 10.

[25]Document no. 11.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  June 6, 2011

cc: Raymond J. Kelly, Esq.
    Robert J. Rabuck, Esq.